UNITED STATES of America, Plaintiff,

v.

WESTERN ELECTRIC COMPANY, INC., and American Telephone and Telegraph Company, Defendants.

Civ. A. No. 82–0192.

United States District Court, District of Columbia.

Dec. 14, 1984.

Jeffrey Blumenfeld, Kevin R. Sullivan, Michael F. Altschul, Luin P. Fitch, J. Philip

Sauntry, Jr., Antitrust Division, U.S. Dept. of Justice, Washington, D.C., for U.S. Dept. of Justice.

Richard C. Schramm, Vice President and Associate Gen. Counsel, Bell Atlantic, Arlington, Va., John M. Goodman, Joseph E. Murphy, Michael J. Shortley, III, Washington, D.C., for Bell Atlantic.

Kenneth E. Millard, Ameritech, Jeffrey J. Kennedy, William F. Dolan, Kirkland & Ellis, Chicago, Ill., Allan J. Arlow, Schaunburg, Ill., for Ameritech Mobile Communications, Inc.

Robert V.R. Dalenberg, Robert M. Ralls, Lucille M. Mates, Marion J. Stanton, San Francisco, Cal., Stanley J. Moore, Washington, D.C., Mary B. Cranston, Pillsbury, Madison & Sutro, San Francisco, Cal., for Pacific Telesis and Pacific and Nevada Bell.

Raymond F. Burke, Gerald M. Oscar, Sandra DiIorio Thorn, White Plains, N.Y., for NYNEX.

Robert B. McKenna, Jr., Leon T. Knauer, Wilkinson, Barker, Knauer & Quinn, Washington, D.C., for U S West.

Joseph C. O'Neil, Dwight M. Whitley, Jr., Bellevue, Wash., for New Vector.

J. Richard Teel, Gen. Counsel, Bell South Advanced Systems, Inc., Birmingham, Ala., Daniel J. Thompson, Jr., Gen. Atty., Bell South Corp., Atlanta, Ga., for Bell South.

## MEMORANDUM

HAROLD H. GREENE, District Judge.

This Memorandum and the accompanying orders dispose of all thirteen pending petitions for waivers of the "line of business" restrictions of the decree.[1]

The decree in this case[2] restricts the Regional Holding Companies[3] primarily[4]

---

1. The first eight of these requests became ripe for Court consideration (after interested parties had an opportunity for comment) on October 10, 1984; the most recent request (that of Bell Atlantic to enter the computer sales and service business) became ripe four days ago, on December 10, 1984.

2. *United States v. Am. Tel. & Tel. Co.,* 552 F.Supp. 131 (D.D.C.1982), *aff'd sub nom. Mary-*

*land v. United States,* 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983).

3. While the decree refers specifically to the Bell Operating Companies, the restrictions apply equally to the Regional Holding Companies.

4. Under sections VIII(A) and (B), the companies may market customer premises equipment and they may publish the "Yellow Pages" directories.

to the provision of local telephone service, by providing in section II(D):

> After completion of the reorganization ..., *no [Operating Company] shall,* directly or through any affiliated enterprise:
>
> 1. provide interexchange telecommunications services or information services;
>
> 2. manufacture or provide telecommunications products or customer premises equipment (except for provision of customer premises equipment for emergency services); or
>
> 3. *provide any other product or service,* except exchange telecommunications and exchange access service, that is not a natural monopoly service actually regulated by tariff (emphasis added).

These line of business restrictions were part of the decree when it was submitted by the Department of Justice and AT & T to this Court for its approval. As the parties' submissions show, and as the Court subsequently stated, the restrictions were required in order to prevent the occurrence or recurrence of anticompetitive conduct, on the theory, proved by experience, that if a company maintains a bottleneck monopoly on an essential gateway (*i.e.,* here the local telephone monopoly), it has the means to discriminate in various ways against, and hence to disadvantage, those in competitive markets which also depend on that gateway.[5]

At the demand of the Court, the parties added to the proposed decree a provision (section VIII(C)) which stipulates that "the [line of business] restrictions ... shall be removed upon a showing by the petitioning [Operating Company] that there is no substantial possibility that it could use its monopoly power to impede competition in the market it seeks to enter." The Court has since stated that, in determining whether a particular line of business restraint must be maintained, it will consider the likelihood that a Regional Holding Company could use its monopoly power to impede competition in the market it seeks to enter,[6] as well as other public interest factors underlying the decree,[7] including the necessity of implementing equal access and the maintenance of quality telephone service.[8]

Against these factors which support tight restrictions on the Regional Holding Companies, the Court has also always been mindful of the need to maintain the viability of the providers of local telephone service[9] and the contribution the Regional Holding Companies could make to competition in markets they might enter.[10] It is with these principles in mind that the waiver petitions have been considered.

## I

Following divestiture, some of the Regional Holding Companies began to file requests for waiver of the line of business restrictions as they sought to enter a wide

---

5. Opinion of July 26, 1984, 592 F.Supp. 846, 851, 852–855; 552 F.Supp. at 186–95. See also *United States v. Terminal R.R. Ass'n of St. Louis,* 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912); *Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 25 L.Ed.2d 359 (1973); *United States v. AT & T,* 524 F.Supp. 1336, 1352–53 (D.D.C. 1981).

6. July 26, 1984 Opinion at 852–855; see 552 F.Supp. at 187.

7. The Tunney Act (15 U.S.C. § 16(e)) required the Court to determine whether entry of the decree in this case was "in the public interest." In making this determination, the Court sought to achieve such objectives as the promotion of competition and the protection of universal tele-

phone service. Opinion of July 26, 1984 at 16; see also *United States v. Western Electric Co.,* 569 F.Supp. 1057, 1120 (D.D.C.), *aff'd sub nom. California v. United States,* —— U.S. ——, 104 S.Ct. 542, 78 L.Ed.2d 719 (1983).

8. July 26, 1984 Opinion at 860, 863.

9. 552 F.Supp. at 187–88. To the extent that the local Operating Companies are in a sound financial position, they should not be under pressure to raise local telephone rates, and low rates are, of course, a prime means for achieving the congressionally-mandated objective of universally-available, affordable telephone service.

10. *Id.* at 187 n. 230.

variety of markets, ranging all the way from computer sales to foreign operations and to real estate investment.[11] In order to promote certainty and uniformity, to reduce repeated and intrusive judicial involvement, and to facilitate the efficient processing of waiver requests, the Court, on July 26, 1984, established general guidelines it expected to follow in reviewing such requests. The Court stated at that time that four safeguards would generally be necessary to ensure that the decree's policies were not violated: (1) the establishment of separate subsidiaries to carry out the new line of business; (2) independent financing by the subsidiary without recourse to the parent; (3) agreements that the monitoring and visitorial provisions of Section VI of the decree will apply to the proposed competitive activities; and (4) a limit on the line of business investment not to exceed ten percent of a Regional Holding Company's estimated net revenues.[12]

The procedure established for consideration of the requests consisted of a review by the Department of Justice, followed by a report by the Department to the Court and an opportunity for interested parties to object or otherwise to comment.[13] This process was designed to provide to the Court the benefit of the Department of Justice's expertise; to minimize direct Court involvement, particularly with respect to noncontroversial requests; and to give the Department and the Regional Holding Companies an opportunity to negotiate for appropriate conditions and safeguards in advance of submission to the Court.

As indicated, presently pending before the Court are thirteen[14] requests for waiver of the line of business restrictions.[15] In its July 26, 1984 Opinion the Court stated that if the Department of Justice concluded that the particular Regional Holding Company had met its burden under that Opinion, and if the Department otherwise concurred in the proposed waiver, it was to submit to the Court a proposed consent order. That order would be entered as the order of the Court unless an interested party filed an objection within fourteen days or the Court *sua sponte* expressed reservations.

Six of the waiver requests forwarded to the Court have received no negative com-

---

**11.** See July 26, 1984 Opinion, page 850, note 3, summarizing the initial waiver requests.

**12.** July 26, 1984 Opinion at 870–872. The ten percent limitation was designed, *inter alia*, to ensure that the Regional Holding Companies will not neglect their primary purpose: the maintenance of high-quality, low-cost telephone service.

**13.** Obviously, various business and other interests could substantially be affected by the Court's action on the requests, and, in conformity with the Tunney Act's broad mandate, the Court has concluded that the views of these interests are entitled to be considered.

**14.** Two additional requests (one by NYNEX, the other by Ameritech) were reviewed by the Department of Justice and transmitted to the Court with negative recommendations. Both requests have since been withdrawn from consideration, at least temporarily. The Court, accordingly, does not consider these two requests at this time.

**15.** These requests are:
   1. Bell Atlantic motion to enter the equipment leasing market;
   2. Bell Atlantic motion to enter computer sales and services business;
   3. NYNEX motion to enter foreign business ventures;
   4. NYNEX motion to provide office equipment and related services through retail stores;
   5. Bell South motion to provide office equipment;
   6. Pacific Telesis motion to establish a real estate subsidiary;
   7. Pacific Telesis motion to provide office equipment through retail stores;
   8. Ameritech motion to provide foreign consulting services;
   9. Ameritech motion to provide cellular services and invest in cellular systems outside the U.S.;
   10. Pacific and Nevada Bell motion to enter into foreign business ventures;
   11. U S West motion to enter foreign business ventures;
   12. U S West/NewVector motion to construct and operate a cellular radio system in the Gulf of Mexico;
   13. U S West motion to provide real estate services and engage in real estate transactions and investments.

ments, and they are before the Court with the Department's favorable recommendation. See Part II, *infra.* The remaining seven requests were likewise recommended for approval by the Department of Justice, but various interested parties have submitted substantive comments or objections. These seven requests are discussed and decided in Part III, *infra.* [16]

## II

Each of the uncontested waiver requests explicitly adopts the four safeguards set forth in the July 26, 1984 Opinion. In addition, the Regional Holding Companies and the Department of Justice have agreed on limitations of some of the requests and on additional conditions which are designed to ensure that the particular enterprises will not operate in an anticompetitive manner.

### A. *Equipment Leasing*

Bell Atlantic seeks a waiver to permit it to enter the equipment leasing market. Specifically, the Company proposes to purchase, through a subsidiary, the assets of Tri-Continental Leasing Corporation (Tricon), an existing equipment leasing company, which would provide third-party financing by purchasing equipment at the request of a customer and leasing it to that customer. The enterprise would lease customer premises equipment (CPE) for which no waiver is required,[17] but it would also

lease other equipment—such as word processing, data processing, and photocopying equipment—for which a waiver is necessary.

In addition to the four safeguards set out in the July 26, 1984 Opinion, Bell Atlantic has agreed to three conditions proposed by the Department of Justice, as follows: (1) in support of the Court's independent financing requirement, Tricon will not finance the equipment or the activities of any Bell Atlantic Operating Company; (2) to prevent Bell Atlantic from becoming involved in the provision of information or interexchange services,[18] Bell Atlantic personnel will not operate or maintain leased equipment; and (3) to avoid disadvantaging its interexchange competitors, Bell Atlantic will not lease equipment or facilities used in the provision of interexchange services.

The Court holds that Bell Atlantic's request for a waiver contains adequate safeguards to ensure that it will not use its monopoly position in local telephone service to obstruct competition in other markets or otherwise to deviate from compliance with the decree.[19] Indeed, Bell Atlantic's ability to finance its CPE offerings through the new enterprise will enhance its competitive position in the CPE market, and the lease of other equipment will not damage the competitive market for equipment financing. The Court will therefore grant the Bell Atlantic request.

---

**16.** Three of the waiver requests were filed by U S West which, on September 24, 1984, filed a notice of appeal of the Court's July 26, 1984 Opinion. On October 30, 1984, this Court *sua sponte* raised the question of its continued jurisdiction in view of the appeal, and it requested the parties to brief this issue. All the parties agreed that the Court could properly retain jurisdiction to decide the requests despite the pendency of an appeal, either because the U S West appeal is premature and subject to dismissal or because the Court has equitable authority to administer the decree notwithstanding the appeal. The Court has concluded that it has jurisdiction to decide these requests, and it is accordingly making the substantive decisions requested by U S West.

**17.** Under section VIII(A) of the decree, the Regional Holding Companies may provide customer premises equipment.

**18.** As indicated above, the Regional Holding Companies are explicitly prohibited from providing such services. For an explanation of the reasons for that prohibition, which will remain in effect until there is real competition in the local telephone business, see July 26, 1984 Opinion at 867–868; see also 552 F.Supp. at 188–89.

**19.** It may be noted that Tricon's share of the existing market is approximately 0.04 percent of all plant and equipment leased.

## B. Foreign Business Enterprises

Five of the pending waiver requests seek permission[20] to enter into various foreign business ventures in the main related to telecommunications.

One of Ameritech's two foreign business requests would permit that company to furnish consulting services to foreign governments, companies, and other entities with respect to foreign operations on lines of business not foreclosed to Ameritech by the decree. The other Ameritech request would permit that company to provide cellular services and invest in cellular systems outside the United States.

Pacific Telesis, NYNEX, and U S West have filed broader requests, seeking waivers to permit them to engage in the following activities in foreign countries: consulting services; training, production, and distribution of printed materials; engineering, design, construction, and product management; sale of telecommunications, computer, and electronic products; data processing services; sale or licensing of software; and the provision of other telecommunications and information services within foreign nations.

■ All of these requests include specific commitments to the four safeguards described in the July 26, 1984 Opinion, and the Regional Holding Companies have also agreed to additional conditions, proposed by the Department of Justice, which are designed to ensure that the proposed foreign activities will not impinge upon the domestic market. Thus, the proposed orders limit the activities to products or services which will be sold outside of the United States; they do not permit the foreign enterprises to engage in telecommunications and information services activities within North America; they prohibit the manufacture of telecommunications equipment and the provision of telecommunications services between nations;[21] and they limit the ability of the Regional Holding Companies to offer software to their foreign business ventures on terms more favorable than those offered to non-affiliated entities.[22]

These requests for waivers meet the standards of the decree. All the activities will solely affect foreign markets, and they will have no negative impact on domestic competitors of the Regional Holding Companies which are entitled to be shielded from competition having its basis in a monopoly enterprise.[23] At the same time, the proposed activities will benefit the foreign trade of the United States and contribute to a more favorable balance of payments. The public policy considerations underlying the decree[24] therefore support the grant of

20. Two of these requests are by Ameritech which has also claimed, however, that it does not require a waiver to provide the same type of exchange telecommunications services in foreign countries that it is permitted to provide in the United States. Since the Court finds that Ameritech's requests meet the standards for waiver, it need not and does not make a finding on that issue.

21. This condition is designed to ensure that these activities will not have an impact on domestic competitors of the Regional Holding Companies.

22. This condition is designed to prevent the Operating Companies from providing rate-based subsidies in software development in competition with United States exporters.

23. Under the Foreign Antitrust Improvements Act of 1982, 15 U.S.C. § 6a, the antitrust laws do not apply to conduct involving trade or commerce with foreign nations unless such conduct has a "direct, substantial, and reasonably foreseeable effect on commerce in the United States or on the export commerce of United States businesses." Accordingly, the Court need not and does not consider the effect of these foreign business ventures on competitive markets abroad, except insofar as they may have an impact on commerce in the United States or on the export commerce of the United States.

24. See generally, 552 F.Supp. at 150–51, 191–94. A major benefit to be expected from divestiture is that the spur of competitive pressures will generate broad innovation in telecommunications technology and that this, in turn, will assist the United States economy through improvements in telecommunications and other information products and services for internal consumption and in the American trade position vis-a-vis foreign nations and their economies. See also, 552 F.Supp. at 180 (removal of the 1956 restrictions on AT & T itself are "likely to benefit the American consumer, American foreign trade, and national defense").

waivers. Accordingly, all the requests will be granted.

### III

A number of waiver requests which have received a favorable Department of Justice recommendation are opposed by other interested parties. It is appropriate at the outset of the discussion of the contested applications to trace the standards the Court has followed in passing upon such applications.

In accordance with its statement in the July 26, 1984 Opinion, the Court has considered all third-party comments in determining whether to approve or disapprove a request for a line of business waiver. Most of the comments were filed by potential competitors, that is, by participants in the market which the Regional Holding Companies seek to enter. Contrary to the suggestions of some of the Regional Holding Companies, such comments will not be discounted on that basis; to the contrary, they are useful to the Court in its consideration of the potential for anticompetitive conduct by the Regional Holding Companies. The Court notes, however, that the line of business restrictions are not intended as barriers to legitimate competition,[25] and it will not permit the comment procedure itself to be used to that end.[26]

█ In addition to its scrutiny of the comments filed by third parties, the Court has, of course, had the benefit of the views of the Department of Justice. The Court has treated the Department's recommendations with some deference, and it has proceeded on the basis of the assumption that, unless there are substantial indications to the contrary, the Department has conducted an adequate review of the requests.[27] Furthermore, to the extent that a Regional Holding Company has explicitly committed itself to abide by certain conditions, the Court has considered that the commitment was made in good faith. Breach of such commitments at a later date would, of course, become the subject of Court action, but vague speculation regarding potential breaches[28] is not a sufficient basis for a denial of an otherwise meritorious waiver request.

The Court will now consider specific contested applications.

### A. Real Estate Services

U S West and Pacific Telesis seek authorization to provide real estate services to the public. Both companies have agreed to the four conditions set forth in the July 26, 1984 Opinion, as well as to additional conditions, proposed by the Department of Justice, to prevent improper cross-subsidization or discrimination. In addition, to meet concerns that the real estate subsidiaries might engage in the interexchange telecommunications or the information business through shared tenant services arrangements, the companies have agreed that their real estate subsidiaries will not provide such services.

Homequity, Inc., a firm which provides employee relocation management services,

---

25. The decree recognized that the line of business restrictions are "in one sense, directly anticompetitive because they prevent a potential competitor from entering the market. The Court must accordingly also consider the extent to which the participation of the Operating Companies would contribute to the creation of a competitive market." See 552 F.Supp. at 187.

26. NYNEX and Pacific Telesis claim that TRW's delayed opposition to their requests for waiver to enter the office products business—that opposition was filed ten days after the comment period had expired—arises out of that company's frustration at losing its bid to take over Sorbus and in an effort to delay or frustrate the

waiver applications. While the Court has permitted TRW to file after the deadline, and while it has considered that company's objections notwithstanding the late filing, it will not take similar action in the future.

27. Petro Com claims that the Department of Justice did not fully evaluate whether NewVector is a "satisfactory" subsidiary for the purpose of granting a line of business waiver. That is not an adequate response to the careful Department filing. See *infra*.

28. Both TRW and Petro Com have made such claims. See *infra*.

opposes the grant of both[29] waivers, on two principal grounds.

First. Homequity claims that the U S West Operating Companies will award employee relocation, property management, and building maintenance services on the basis of a competitive bidding process which can readily be abused to the advantage of Beta West, U S West's subsidiary. However, the Court has concluded that there is no reason to believe that the conditions agreed to by U S West, particularly the separate subsidiary provisions, will not sufficiently protect Homequity and other entities in the real estate market from unfair bidding practices[30] and unfair competition in general.[31] The special conditions demanded by Homequity as an alternative to denials of the waiver requests[32] are not necessary, and in addition they would embroil the Court unduly in the day-to-day operations of the Regional Holding Companies and their subsidiaries.

■ Second. Homequity argues that the link between the Regional Holding Companies and their real estate subsidiaries would give these subsidiaries unfair advantages because of "special access to information regarding new technological advances in the telecommunications field, as well as goods and services." That argument proves too much. Telecommunications are significant in almost every market, and the advantage cited by Homequity could, if accepted as a basis for denial here, bar subsidiaries of the Regional Holding Companies from entering almost any line of business—an outcome inconsistent with the decree. In this case, where the new line of business is remote from the field of telecommunications proper, where it will be operated through separate subsidiaries, and where other safeguards required by this Court and the Department of Justice were accepted by the petitioning company, there is no basis for a denial of entry on these grounds.[33]

The U S West and Pacific Telesis requests for authority to provide real estate services to the public meet the standards for waiver of the line of business restrictions, and they will be granted.

## B. Offshore Cellular Radio Systems

U S West and its subsidiary NewVector Communications, Inc., seek a waiver which would permit the latter to proceed in a joint venture with Fluor Engineers, Inc., to construct and operate a cellular radio system covering primarily offshore areas in a portion of the Gulf of Mexico. The system would handle calls between offshore points, such as oil rigs and pleasure boats, as well as calls between offshore and onshore points which would be interconnected at Venice, Louisiana. Local traffic in the Venice area would be transmitted by way of the landline local network; traffic beyond that area would be transmitted by interexchange carriers. Because this venture would involve communications between two points outside a LATA or between a point within a LATA and another outside a LATA, it is not considered "exchange telecommunications and exchange access service,"[34] and NewVector may participate in it only pursuant to a waiver.

NewVector has agreed to the four conditions established in this Court's July 26, 1984 Opinion, and it has also agreed to the

---

**29.** Pacific Telesis' request does not cover employee relocation services. Nevertheless, as indicated in note 33, *infra,* at least some of Homequity's objections apply to that request.

**30.** The separate subsidiary and financial conditions will, *inter alia,* remove the U S West incentive to engage in such practices.

**31.** These safeguards also dispose of the Homequity argument that there would be a substantial potential for cross-subsidization.

**32.** Homequity would, among other things, require the establishment of a special court-supervised competitive bid process.

**33.** Homequity's concern that the real estate subsidiaries of the Regional Holding Companies may eventually join forces to form an interconnected nationwide real estate service is entirely speculative at this juncture. It will be time enough to consider that problem if a move in that direction is made.

**34.** Section II(D)(3) of the decree.

conditions proposed by the Department of Justice (1) that it will not provide service between LATAs or between a point in the Gulf of Mexico and any point on land other than the cell site in Venice, Louisiana, (2) that it will offer equal access to any interested interexchange carrier, and (3) that it will not engage in least cost carrier or route selection.[35]

Petroleum Communications, Inc. (Petro Com), which has also filed an application with the Federal Communications Commission for the operation of an offshore cellular system in the Gulf of Mexico, objects to the U S West application on a number of grounds.

■ First. Petro Com claims that New-Vector is not "a satisfactory subsidiary" of U S West because it will conduct operations some of which require a waiver, some of which do not,[36] and it therefore requests that a separate subsidiary be established for the activities for which the waiver is being sought. There is no warrant for such a requirement. NewVector will *not* combine activities in which it has monopoly power with competitive activities; all of its activities will be subject to competition. Thus, the concerns that led the Court to require the Regional Holding Companies to establish separate subsidiaries for their new lines of business do not apply.[37] Accordingly, the Court will not require U S West to establish a separate subsidiary for the cellular system in the Gulf of Mexico.

■ Second. Petro Com claims that the financing of the cellular venture does not comply with the Court's order; that New-Vector will engage in the resale of interexchange telecommunications services; and that the Department of Justice failed to

give adequate consideration to various factors. None of these objections has merit. NewVector and U S West have agreed to comply with the Court's financing conditions as well as with the Justice Department's proposals designed to prevent the provision of interexchange telecommunications services. As the Court noted above, absent concrete factual evidence to the contrary, it will assume that agreements will be honored and the Court's orders obeyed. Petro Com's claim that the Department of Justice failed to give adequate consideration to various factors is also without any basis. The Department's submission indicates that it considered this proposal in May of 1984, and subsequently scrutinized it again for compliance with the terms of the July 26, 1984 Opinion. Nothing in Petro Com's submission raises issues or facts the Department overlooked, and the objection must therefore be rejected.

■ Finally, Offshore Telephone Company, a company which provides toll network service to subscribers in the Gulf of Mexico, has also filed comments objecting to the NewVector request. Offshore's principal objection is that this waiver would permit competition in an area served by a small, existing telephone common carrier. That objection is not compelling. The Federal Communications Commission has authorized the establishment of two competing cellular systems in the Gulf of Mexico. There is no reason why NewVector should be prevented from being one of the cellular suppliers, particularly since the separate financing requirements will protect U S West from any associated risk.[38]

The request of U S West and NewVector for a waiver will be granted.

---

**35.** Such selection would be a means by which NewVector could allocate the interexchange segment of its cellular business to an interexchange carrier or carriers of its choice.

**36.** NewVector operates cellular systems in its own area (at Phoenix, Arizona and Denver, Colorado) for which no waiver was required because these activities are part of U S West's line of business. The system in the Gulf of Mexico would constitute a different line of business,

however, and for that reason a waiver of Section II(D) restrictions is required.

**37.** Conceptually it makes no difference that one activity requires a waiver while others do not; the important consideration is that monopoly operations are not implicated.

**38.** Indeed, a denial of the NewVector request would not insulate Offshore from competition; it would merely shift that competition to a different company.

## C.  Office Products

NYNEX, Pacific Telesis, and BellSouth seek waivers to enter the office products business [39]—an enterprise that requires a waiver because it does not constitute the provision of customer premises equipment within the meaning of section VIII(A) of the decree.[40]  Additionally, Bell Atlantic has requested permission to enter the computer sales and services business through the acquisition of the Sorbus Service Division of Management Assistance, Inc.

■  All four companies have agreed to the conditions specified in the July 26, 1984 Opinion as well as to two additional conditions recommended by the Department of Justice to prevent cross-subsidization between the operating telephone companies and the office equipment business.  These additional conditions restrict the subsidiaries from marketing the products of the office equipment business jointly with the products and services of an Operating Company, and they prohibit the office products business from procuring goods and services for resale through a procurement organization that also purchases goods and services for an Operating Company.

TRW, Inc. filed an objection to the requests insofar as they would permit the Regional Holding Companies to provide computer maintenance services, suggesting that such services are inextricably tied to the provision of exchange and exchange access services, and that, if the waivers were granted, there would be a danger that the Regional Holding Companies will abuse their bottleneck monopoly in various ways. According to TRW, the companies could favor their affiliated computer maintenance companies with respect to such essential services as exchange diagnostics, installation services, and access to technical information; they could cross-subsidize their computer maintenance businesses from revenues from their local monopolies; and they could obtain marketing advantages from the known link between them and their computer maintenance subsidiaries.[41] Accordingly, TRW requests that the Court either deny the waiver requests altogether insofar as they relate to computer maintenance services or impose strict additional conditions.[42]

Exclusion of the subsidiaries of these Regional Holding Companies from providing computer maintenance services would effectively bar them from computer sales as well, for it is unlikely that consumers would purchase complex, sophisticated equipment such as computers without associated maintenance plans, particularly when competitors do offer maintenance. So drastic a prohibition would obviously not be warranted unless there existed a sub-

---

**39.**  This would entail the sale, lease, installation, maintenance, repair, and training for the use of such equipment as computers, peripherals, electronic typewriters, answer and recording devices, office security systems, desk-top copiers, inside wiring, and various incidental products and services.

**40.**  After first taking a different position, the Department of Justice is apparently now of the view that computer products and systems interconnectable to telecommunications facilities constitute CPE.  It is unnecessary to decide that issue inasmuch as the requests meet the standard for a waiver of the line of business restrictions.

**41.**  TRW makes these objections even more emphatically with respect to Bell Atlantic's request for a waiver to enter the computer sales and services business through the acquisition of Sorbus.  Sorbus does not manufacture telecommu-nications products or customer premises equipment, and it does not provide interexchange telecommunications services or information services.  However, it does provide third-party maintenance for computers and peripheral equipment of various manufacturers, and it sells items used in computers and computer related equipment.

**42.**  These conditions would include explicit prohibitions on the offering by the Regional Holding Companies of computer maintenance services within any exchange area served by an affiliated Operating Company; on the provision of local exchange service to their computer maintenance subsidiaries on terms or conditions more favorable than those available to independent computer maintenance organizations; and on any other practice that might give the affiliated computer maintenance organizations a marketing advantage over their independent competitors.

stantial possibility of anticompetitive consequences.

In view of the conditions already imposed upon the waiver, the Court concludes that such consequences are unlikely.[43] Any Operating Company incentive to discriminate in favor of a subsidiary affiliated with a Regional Holding Company is significantly attenuated by the separate subsidiary relationship and the separate financial structure. Furthermore, such discrimination would have to be relatively open if it were to have an impact upon customer preferences, and it would thus be readily apparent to competitors.

That is not to say that TRW's concerns are without force or validity; they are not. However, after carefully analyzing the TRW arguments, the Court has ultimately come to the same result as the Department of Justice, that is, that sufficient safeguards exist in the waiver order, as modified by the various conditions, to prevent improper discrimination. Nevertheless, because the issue is a close one, and because some potential for anticompetitive activity by the Regional Holding Companies is present, the Court urges the Department of Justice to be particularly vigilant in the exercise of its monitoring and inspection authority with respect to these enterprises, and to take prompt action, by a report to the Court and otherwise, if violations are detected.

For the reasons stated, the Court will approve the NYNEX, Pacific Telesis, and BellSouth requests to provide office equipment and Bell Atlantic's request to enter the computer sales and services business.

### IV

In deciding line of business waiver requests, the Court must maintain a careful balance in two respects. Substantively, the Court must ensure, on the one hand, that the Regional Holding Companies—which are monopolies in their respective areas, having control of the local switching gateways through which many of their potential competitors must pass—are not given the opportunity to establish an anticompetitive position in a competitive market similar to that which the Bell System enjoyed prior to its break-up. On the other hand, however, the Court must take care not to prevent these companies from entering markets where such entry would not be inconsistent with the policies underlying the decree but might actually support such policies. Procedurally, the Court must maintain a similar balance: it has the obligation to permit all interested parties to submit their views, comments, and objections, especially those parties which might be injured by unfair competition from the monopolists; yet it must also take care not to become unduly and repeatedly involved in the details of many requests for waivers.

The solution the Court adopted to deal with these dilemmas was the establishment of general guidelines in the July 26, 1984 Opinion. These guidelines embody the various policy objectives of the decree, they are applicable to potential waiver requests generally, and they assign to the Department of Justice a significant role for the negotiation of specific conditions pertinent to specific situations.

The requests for waiver now before the Court and the process which brought them here have borne out the Court's expectations when the July 26, 1984 procedure was announced. The orders submitted to the Court are the product both of third-party comments and of negotiations between the respective applicants and the Department of Justice; all of them conform to the guidelines previously announced by the Court; and all of them are here with favorable Department of Justice recommendations.

It appears therefore that the procedure, the guidelines, and the Department's intensive participation have resulted in a system which appropriately takes account of the

---

**43.** For the same reason, the Court will not impose the additional conditions requested by TRW.

competing interests, promotes negotiation and flexibility as to the proper scope of any proposed enterprise, and permits the expeditious resolution of the issues.[44]

On the merits of the various requests, it is clear that, but for the conditions to which the various petitioning Regional Holding Companies have agreed, the Court could not have permitted them consistently with its responsibilities under the decree, to enter the broad and varied lines of business to which they are now committed, going far beyond those to which they were explicitly restricted as of January 1, 1983 by section II(D) of the decree (see page 258, *supra*). The Court is confident, however, that these conditions will adequately protect the public from anticompetitive practices as well as from infringement of the other policies underlying the decree in this case.[45]

Accordingly, for the reasons stated above, the Court is this day approving all of the requests for waivers submitted to it, in accordance with the consent orders agreed to by the parties.

---

**44.** It may be expected, moreover, that, as precedents are set by action on specific applications, the result will be both increasing certainty and decreasing judicial involvement.

**45.** See, *e.g.,* page 258 and notes 7, 9, 12, and 24, *supra.*